# **EXHIBIT A**

TRIBAL CREDIT CODE
OF THE MINTO TRIBE
EFFECTIVE DATE: October 15, 2018

## ARTICLE 1

### SHORT TITLE, FINDINGS, AND PURPOSE

1.1 <u>Title</u>. This law shall be referred to as the Tribal Credit Code of the Minto Tribe.

1.2 <u>Findings and Resolution</u>. The Tribal Council of the Minto Tribe
hereby finds as follows:

     1.2.1 Economic development is a central mission of the Tribe, in order
to provide funding for governmental services to Tribal Members. Regrettably, the
Tribe lacks ready access to familiar governmental revenue streams to which
state and other governments have become accustomed, such as property,
income and sales tax.

     1.2.2 The Tribe is committed to revenue generation, which includes developing
entrepreneurial businesses and engaging in e-commerce. To fund services to citizens, the Tribe
must engage in enterprise, as some states have done with the establishment of state lotteries
and the like.

     1.2.3 The Tribe also continually seeks to develop jobs for Tribal Members and to create
and foster economic development opportunities to improve the quality of life for the Tribe,
including services the Tribe provides to Tribal Members.

     1.2.4 The Tribe is working to develop and foster an economic environment in and around
its lands in Alaska that will be attractive to Tribal Members, provide desperately needed jobs,
and support basic necessities such as food, housing, and heating costs for Tribal Members and
also allow for development and improvement of Tribal assets.

     1.2.5 E-commerce represents a new ray of economic hope for the Tribe and its members.
The Tribe seeks to develop online lending as an important government revenue source to fund
the Tribal government and to capitalize basic infrastructure and public works.

     1.2.6 From the financial struggles and experiences of Tribal Members, the Tribe is
acutely aware that lack of access to credit and onerous loan terms are significant concerns for
Borrowers. The Tribe believes it can provide safe, reliable and Borrower-protective credit
products that fill urgent and pressing credit needs for Americans.

     1.2.7 The Tribe believes that its businesses need to work for everyone, including
consumer and commercial Borrowers. The Tribe's intent is to be diligent in establishing the
businesses, requiring their close management and oversight.

1.2.8 In 2000, Congress also presented definite and unambiguous support for the unencumbered development of tribal economies. In the Native American Business Development Act, Congress made specific findings regarding tribal economic development and the role of the federal government and federal agencies in that -building pursuit. Specifically, the Act found that:

(i)      consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, Indian tribes retain the right to enter into contracts and agreements to trade freely, and seek enforcement of treaty and trade rights;

(ii)      the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes;

(iii)     the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

(iv)     despite the availability of abundant natural resources on Indian lands and a rich cultural legacy that accords great value to self-determination, self-reliance, and independence. Native Americans suffer higher rates of unemployment, poverty, poor health, substandard housing, and associated social ills than those of any other group in the United States;

(v)      the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to—

      a.  encourage investment from outside sources that do not originate with the tribes; and
      b.  facilitate economic ventures with outside entities that are not tribal entities;

(vi)     the economic success and material well-being of Native American communities depends on the combined efforts of the Federal Government, tribal governments, the private sector, and individuals;

(vii)    the lack of employment and entrepreneurial opportunities in the communities referred to in paragraph (7) has resulted in a multigenerational dependence on Federal assistance that is—

      a.  insufficient to address the magnitude of needs; and
      b.  unreliable in availability; and

> (viii)   the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available to address the challenges faced by those groups—
>
>    a.  the resources of the private market;
>    b.  adequate capital; and
>    c.  technical expertise.

25 U.S.C. § 4301(a). With a clear Congressional intent to encourage exactly this sort of economic development, the Council believes it is in the Tribe's best interest to establish, operate and regulate online lending enterprises. Accordingly, the Council adopts this Tribal Credit Code.

     1.2.9 The Minto Tribe is a federally recognized tribe and the Tribal Council is the official governmental body of the Native Village of Minto;

     1.2.10 Under the Constitution and By-Laws the Minto Tribal Council is authorized to pass resolutions and codes governing the management of all economic affairs and enterprises of the Tribe; and

     1.2.11 The Tribe has determined that it is in the best interest of the economic development of the Minto Tribe to expand into the financial services industry as an essential governmental revenue-creating function.

     1.2.12 The Minto Tribe established by resolution Benhti Economic Development Corporation ("BEDCO") on October 2, 2018.

     1.2.13 The Tribe would like to ensure that all Tribal activities, including lending activities, follow the spirit of federal regulations and the Tribe seeks to provide sufficient control and protection for both lenders and Borrowers through its own sovereign governmental regulation and oversight;

     1.2.14 The Tribe recognizes that several state and federal agencies have an interest in this industry, however, the Tribe is a sovereign government and will serve as its own regulator for all lenders operating from its sovereign lands;

     1.2.15 NOW, THEREFORE, BE IT RESOLVED that the Tribal Council of the Minto Tribe enacts the following Tribal Credit Code ("Code").

1.3 <u>Authority</u>. The Tribe hereby adopts this Code pursuant to the authorities referenced above.

1.4 <u>Scope</u>. This Code applies to all Financial Services made or offered from the Minto Indian Reservation or otherwise subject to Minto Tribal jurisdiction.

1.5 <u>Applicability</u>. The Minto Tribal Council finds that any violation of this Code or any regulation adopted thereunder will demonstrably and seriously impact the public health, safety, welfare, political integrity and economic security of the Tribe. Therefore, this Code, and any

regulations adopted thereunder, apply to all Persons participating in Financial Services transacted under the Tribe's auspices or otherwise subject to the Tribe's jurisdiction and all Financial Services transacted within the Tribe's jurisdiction.

ARTICLE 2

DEFINITIONS

2.1 Definitions. For purposes of this Code, the following words and phrases have the following meanings:

2.1.1 "ACH" means automated clearing house.

2.1.2 "Board of Directors" or "Board" means the Board of Directors of Minto Financial.

2.1.3 "BEDCO Board" means the Board of Directors of Benhti Economic Development Corporation ("BEDCO").

2.1.4 "Borrower's Agreement" means any contract or document memorializing an extension of credit, whether Commercial or Consumer.

2.1.5 "Code" means this Tribal Credit Code, as it may be amended from time to time.

2.1.6 "Commission" means the one to three-member Regulatory authority that is authorized to oversee and grant Licenses and provide regulatory oversight and compliance enforcement pursuant to this Tribal Credit Code, and, specifically, but not limited to, Article 3.

2.1.7 "Commissioner" means any member of the Commission.

2.1.8 "Commercial Financial Services" means any extension of credit for purposes that are primarily business, commercial, investment, or any solicitation therefore, made under the auspices of the Tribe or subject to Tribal jurisdiction. It includes any extension of credit to an organization regardless of purpose or that an individual guarantees the extension of credit or provides security therefor, including, without limitation, any extension of credit to a corporation, partnership, or limited liability company.

2.1.9 "Commercial Financial Services License" means a Person or entity that is licensed by the Commission to provide Commercial Financial Services.

2.1.10 "Consumer" or "Borrower" means a natural person who obtains an extension of credit primarily for personal, family or household purposes.

2.1.11 "Consumer Financial Services" means any extension of credit to an individual for purposes that are primarily personal, family or household, or any solicitation therefor, made under the auspices of the Tribe or subject to Tribal jurisdiction. Consumer Financial Services

does not include any extension of credit to an organization, including but not limited to a corporation, partnership, or limited liability company.

2.1.12 "Consumer Financial Services Licensee" means a Person or entity that is licensed by the Commission to provide Consumer Financial Services.

2.1.13 "Employer License," means a Person or entity licensed by the Commission to employ individuals engaged in Consumer Financial Services who meet Commission standards. Each Employer License shall certify the number of Employees employed by Licensee.

2.1.14 "Enterprise" means any business entity, operation or enterprise wholly-owned and controlled by the Tribe.

2.1.15 "Financial Services" means any extension of credit, or any solicitation therefore, made under the auspices of the Tribe or subject to Tribal jurisdiction.

2.1.16 "License" means any license Issued pursuant to this Code with respect to Financial Services conducted by the Tribe on the Native Village of Minto or otherwise subject to Tribal jurisdiction. It includes a Consumer Financial Services License, Commercial Financial Services License, Vendor License, or Employer License, issued by the Commission. A License is a revocable privilege.

2.1.17 "Licensee" or "Financial Services Licensee" means any holder of a License.

2.1.18 "Person" means any individual, tribe (whether or not federally recognized), any governmental entity of a tribe, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity or group.

2.1.19 "Tribe" or "Tribal" means the Minto Tribe or pertaining to the Minto Tribe, a federally-recognized sovereign American Indian tribe. For purposes of this Code, the entities referred to as "Native Village of Minto" and "Minto Tribe" shall be understood to be the same entity.

2.1.20 "Tribal Law" means all laws of the Minto Tribe, including, but not limited to, its Constitution, laws, rules, regulations, Tribal Council resolutions, and this Code.

2.1.21 "Vendor Licensee" means a Person or entity that is licensed by the Commission to provide services or funding to aid in the providing of financial services by a Financial Services Licensee.

2.2 <u>Interpretive Provisions</u>. For purposes of this Code, unless the context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Code as a whole and not to any particular provision of this Agreement; (b) references to any Article or Section are references to Articles and Sections in or to this Agreement and references to any paragraph, subsection, clause or other subdivision within any Section or definition refer to such paragraph, subsection, clause or other subdivision of such Section or definition; (e) the term

"Including" and all variations thereof means "including without limitation;" except as otherwise expressly provided herein, references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (g) references to any Person include that Person's successors and assigns; and (h) headings are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

ARTICLE 3

TRIBAL FINANCIAL SERVICES LICENSING & REGULATORY COMMISSION

3.1 Establishment and Purpose. The Tribe will create a one to three-member Commission responsible for licensing, regulatory oversight, and enforcement of this Tribal Credit Code. The creation of the Commission shall be approved via Tribal Council Resolution.

3.2 Duties and Powers of Commission. The Tribe hereby grants to the Commission the authority and responsibility to discharge the duties imposed by this Code including:

   3.2.1 Publishing and enforcing regulations and rules furthering the purpose and provisions of this Code provided that such regulations shall take effect only upon approval of the Tribe.

   3.2.2 Employing advisors as the Commission may deem necessary for the Commission to implement the authority granted in and meet the requirement of this Code, subject to the approval of the BEDCO Board. Advisors may include, but are not limited to, lawyers, accountants, managers, compliance consultants, security personnel, inspectors, law enforcement specialists, financial services professionals and such other persons.

   3.2.3 Reviewing and approving or disapproving any applications for a License, including conducting or arranging for background investigations of all Applicants and all further Licensing oversight and authority as further described in Article 4 of this Code.

   3.2.4 Examining or inspecting or causing to be examined or inspected each Licensee annually and more frequently if the Commission consider it necessary.

   3.2.5 Receive and record Consumer complaints regarding any Licensee or Person subject to this Code and to generally monitor risks to Consumers in the offering or provision of Consumer financial products or services.

   3.2.6 Making or causing to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Code or any order of the Commission, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unfair, deceptive or abusive act or practice or violation of this Code or any order of the Commission.

3.2.7 Initiating enforcement actions under this Code and related regulations, as further described in Article 9, as well as the sole authority to coordinate enforcement actions with other governmental agencies and departments.

3.2.8 Adopting a schedule of fees to be charged for the processing, issuance and renewal of Licenses, including fees or charges associated with conducting background checks; for reasonable examinations of Licensees; and for services rendered relating to transcripts and the furnishing or certifying of copies of proceedings, files and records and to impose the forgoing fees as applicable, subject to the approval of the BEDCO Board.

3.2.9 Collecting fees and penalties in connection with this Code, to be deposited in accounts established, safeguarded and monitored by BEDCO.

3.2.10 Establishing procedures designed to permit detection of any irregularities, fraud and the like and to allow for the redress of Consumer complaints against a Licensee.

3.2.11 Examining under oath, either orally or in writing, in hearings or otherwise, any Licensee or Person, or agent, officer or employee of any Financial Services Licensee, or any other witness with respect to any matters related to this Code and to compel by subpoena the attendance of witnesses and the production of any books, records and papers with respect thereto. Upon refusal to appear or produce, the Commission may apply to a court of competent jurisdiction to compel appearance or production.

3.2.12 Holding public hearings, issuing notice of hearings, issuing subpoenas requiring the attendance of witnesses and the production of evidence, administering oaths and taking such testimony as the Commission deem necessary.

3.2.13 Disciplining any Licensee or Person engaging or participating in Financial Services in violation of this Code by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any License pursuant to the hearings and due process required by this Code.

3.2.14 Settling, subject to any approval of the BEDCO Board, any dispute to which the Commission are a party relating to the Commission's authorized activities.

3.2.15 Coordinating and monitoring fair lending efforts with sister sovereigns. Including other U.S. states, territories, and with the U.S. Federal Government and Foreign Governments.

3.2.16 Protecting any information provided to the Commission by a Person or Licensee as proprietary and/ or confidential.

3.2.17 Exercising all incidental powers necessary to carry out the purposes of this Code.

3.3 <u>Commissioners</u>. [RESERVED]

3.4 <u>Reporting</u>.

3.4.1 Annual Report. No more than thirty (30) days after to the end of each fiscal year, the Commission shall deliver a report to the BEDCO Board containing an annual operating budget and summary of all Commission activities during such prior year.

3.4.2 Quarteriv and Annual Reports. On a quarterly and annual basis, the Commission shall file a report with the Tribe summarizing reports received from each Licensee and make such comments as it deems necessary to keep the Tribe fully informed as to the status of the Commission's activities.

3.4.3 Reporting bv Commission. As requested by the Tribe the Commission shall provide reports to the Tribe.

ARTICLE 4

LICENSING

4.1 <u>License Required</u>. Any Person seeking to engage in Commercial or Consumer Financial Services subject to this Code or, when applicable, to provide direct Consumer financial related services to a Licensee or be employed by a Licensee, shall apply for and receive all required licenses prior to engaging in Consumer Financial Services, providing Consumer financial related services to a Financial Services Licensee (such as data and lead providers, call centers, etc.), or being employed by a Financial Services Licensee.

4.1.1 Every Vendor that provides or receives, or is likely to provide or receive at least One Hundred Thousand ($100,000) Dollars in any twelve (12) month period from a Financial Services Licensee in exchange for services or aid in providing financial services subject to this Code is required to have a current and valid Vendor License as issued by the Commission. The Commission may allow for a waiver for good cause.

4.1.2 Every Person extending financing, directly or indirectly, to any Financial Services Licensee is required to have a current and valid Vendor License issued by the Commission.

4.1.3 Every Financial Services Licensee shall maintain an Employer License for all employees employed in a position that routinely has substantive interaction with Borrowers. The Employer License will list the number of and names of employees.

4.1.4 If the applicant is a Person other than a natural person, the qualifications required by this Section are also required of any executive officer, director or partner of the firm, partnership, association or other form of entity.

4.1.5 A Person who engages in financial services without charging or collecting interest or other consideration for a transaction or charges or collects nominal or incidental consideration is not required to obtain a Licensee to engage in Financial Services, but is required to otherwise comply with the provisions of this Code.

4.2 <u>Revocable Privilege</u>. A License is a revocable privilege to do business within the jurisdiction of the Tribe.

4.3 <u>Applications</u>. Any applicant applying for any of the Licenses under this Code (Vendor, Employer, Financial Service Provider, etc.) shall complete and submit an application promulgated by the Commission and pay any associated fees as determined by the Commission. At a minimum, each application shall contain:

     4.3.1 The applicant's full legal name, and any other names by which the applicant is or has been known (including trade names and nicknames).

     4.3.2 The ownership, directors (if any) and senior management of the applicant.

     4.3.3 The name and address of the registered agent who will accept service from the Commission on behalf of the applicant if a License is issued.

     4.3.4 A sworn statement that if the License applied for is issued, the applicant will abide by the Code (including all applicable Tribal and federal laws and regulations as applicable); the information contained in the application is true and correct to the best of the applicant's knowledge.

     4.3.5 The application fee.

4.4 <u>Review and Issuance of License</u>. The Commission shall review each application for a License, within a maximum of sixty (60) days. The Commission may issue a License if it believes such issuance is in the best interests of the Tribe. Licensure is a privilege, not a right, and the decision to issue any license rests in the sole discretion of the Commission.

4.5 <u>Restrictions on Licensure</u>. The Commission may issue Licenses that authorize a Licensee to provide all types of Financial Services under this Code or a limited-purpose License that only authorizes certain types of Financial Services. A license, for example, may indicate it Is for Commercial Financial Services, Consumer Financial Services, or all Financial Services. Each License shall bear on its face the name of the Licensee, the issuance date, the license number and license scope.

4.6 <u>Records</u>. The Commission shall maintain, on a confidential basis, all applicants' files, including all applications and all information submitted therewith, for no less than three (3) years from the date that such an applicant ceased to hold a License, or if such applicant never held a License, from the date that such applicant was denied a License.

4.7 <u>License Denial, Suspension or Revocation of License</u>.

     4.7.1 Denial; Temporary Suspension or Revocation. The Commission shall not unreasonably withhold issuance or renewal of a License. The Commission shall have a process for reinstatement for suspended or revoked Licenses. The Commission shall deny a License or suspend or revoke a License if the Commission finds that an applicant or Licensee:

(i)     Made or offered Financial Services not authorized by this Code;

(ii)    Has a senior officer that includes a Person or Persons not possessing honesty, truthfulness or good character;

(iii)   Made a material misstatement or omission on the application or on any document filed with the Commission;

(iv)   Withheld or provided incomplete or insufficient pertinent information;

(v)    Failed to pay any application fee (including for any renewal);

(vi)   Violated or aided, abetted or conspired with another Licensee or Person, or knowingly or knowingly caused any Licensee or Person to or otherwise participated in a violation of this Code or the rules and regulations of the Commission or applicable federal law;

(vii)  Is insolvent;

(viii) Employs a Person that has been convicted or has entered a plea of no contest In any jurisdiction of any felony or any other crime involving breach of trust or dishonesty;

(ix)   Has a financial judgment ordered against the applicant or Licensee in a civil action based on fraud, deceit or misrepresentation;

(x)    Employs any Person in a Financial Services business whom the Licensee knew or should have known was convicted of fraud, theft or embezzlement;

(xi)   Refuses to comply with any lawful order, inquiry or directive of the Commission or the Board of Directors;

(xii)  Attempts to bribe or offer anything of value to any Person,member of the Board of Directors or Commissioner in an attempt to avoid or circumvent Tribal law;

(xiii) Poses a threat to the public interest or the effective regulation of Financial Services;

(xiv) Creates or enhances the danger of unsuitable, unfair or illegal practices and methods and activities in the conduct of Financial Services; or

(xv)  Was a former Licensee pursuant to this Code whose License was suspended or revoked and not subsequently reinstated.

4.7.2 Procedure for Suspension or Revocation.

(i)     Upon reasonable basis for belief that a violation of the Code has occurred, the Commission or their designee may either undertake an investigation of the Licensee, or serve upon such Licensee an order to show cause why the Licensee's License should not be suspended or revoked, or why the Licensee should not be enjoined from conducting Financial Services under this Code.

(ii)    Such notice shall state the reason for the suspension and/or order, and the time and place for the hearing before the Commission.

(iii)   Licensee shall have an opportunity to present testimony and cross-examine opposing witnesses, and to present any other evidence as to why a suspension, revocation order or Injunction should not be issued.

(iv)    The hearing shall be governed in all respects in accordance with Tribal law and the Commission regulations. Any suspension or revocation decision of the Commission after hearing may be appealed in accordance herewith.

4.8 Period of License. Each license may be issued for a period not to exceed two (2) years from the date of issuance.

4.9 Renewal of License. The Commission may deny renewal of a License or suspend or revoke a license if the Commission finds the existence of any circumstance listed in section 4.7.1 above, or that any other fact or condition exists that, if it had existed at the time of the original application for the License, would have warranted the Commission to refuse to issue the License.

4.10 Transferability of Licenses. Licenses issued by the Commission hereunder shall not be transferable and may only be utilized by the Person in whose name it was issued. Any change in the ultimate ownership or management control of any Licensee shall be deemed a transfer for purposes of this subsection, and shall not be permitted without the prior written consent of the Commission.

4.11 Voluntary Surrender of License. Any Licensee registered pursuant to this Code may voluntarily surrender its License at any time by giving written notice of the surrender to the Commission.

## ARTICLE 5

## REQUIREMENTS OF LICENSEES

5.1 Legal Compliance by Consumer Financial Services Licensees. The Tribe requires Consumer Financial Services Licensees to comply at all times with the provisions of this Code, rules and

regulations promulgated pursuant to this Code, all other applicable Tribal, and principles of federal law and regulations as applicable. In particular, the Tribe requires Consumer Financial Services Licensees to comply with the spirit of the following federal laws, regardless whether they apply to Tribal-related lending: Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5491-5493; Truth in Lending Act, 15 U.S.C. § 1601 et seq., and related regulations at 12 C.F.R. Part 1026; Consumer Leasing Act, 15 U.S.C. §§ 1667 et seq., and related regulations at 12 C.F.R. Part 1013; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and related regulations at 12 C.F.R. Part 1002; Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and related regulations at 12 C.F.R. Part 1005; Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. and related regulations at 12 C.F.R. Part 1022; privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq., and related regulations at 16 C.F.R. Part 901; Military Protection Act, 10 U.S.C § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; and Service members' Civil Relief Act, 50 U.S.C. App. §§ 501-596, together with any similar or future acts and regulations promulgated thereunder.

5.2 Legal Compliance by Commercial Financial Services Providers. The Tribe requires Commercial Financial Services Licensees to comply at all times with the provisions of this Code, rules and regulations promulgated pursuant to this Code, all other applicable Tribal, and federal law and regulations as applicable. This includes the federal laws specified in Section 5.1 as applicable.

5.3 Prohibited Acts by Licensees. A Licensee shall not:

    5.3.1 Engage in any Financial Services other than those allowed under this Code or as permitted by its License.

    5.3.2 Threaten to use or use any criminal process to collect on any amounts outstanding.

    5.3.3 Use any device or agreement which would have the effect of charging or collecting more fees, charges or interest than allowed by this Code.

    5.3.4 Use or cause to be published or disseminated any advertisement that contains false, misleading or deceptive statements or representations.

    5.3.5 Engage in unfair, deceptive, fraudulent or abusive practices.

    5.3.6 Tie or otherwise condition the providing of Financial Services to the sale of any good or service by the Licensee.

    5.3.7 Fail to maintain a system of minimum internal controls sufficient to meet industry standards and as further required by regulations as may be promulgated by the Commission.

5.4 Books, Accounts and Records, Examinations, Costs.

5.4.1 A Licensee shall maintain at each location at which it conducts business all books, accounts and records that the Commission reasonably requires. Each Licensee shall:

    (i)    Ensure that the books, accounts and records are sufficiently detailed to comply with the Code and all applicable Tribal and federal laws; and

    (ii)    Maintain the books, accounts and records separately from any other business in which the Licensee is engaged and shall retain the books, accounts and records for at least three (3) years.

5.4.2 The Commission may examine or cause to be examined each Licensee annually. In conducting such examination, the Commission or its agent may examine the books, accounts and records to determine if the Licensee has complied with this Code and any implementing regulations adopted pursuant to this Code. The Licensee shall pay the reasonable cost of the examination as may be required by the Commission in accordance with its regulations.

5.5 <u>Annual Reports</u>. Every Licensee shall file a confidential report with the Commission annually or more frequently if requested by the Commission. Each report shall contain information sufficient for the Commission to determine compliance with this Code including, at a minimum, the following: (1) the name, address and telephone number of the Licensee; (2) the names, addresses and titles of ail of senior management of the Licensee; (3) a sworn statement that the Licensee, to the best of its knowledge, has complied and will continue to comply with all applicable Tribal and federal laws; (4) the name and address of the registered agent who will accept service of process from the Commission on behalf of the Licensee. Such Annual Reports, upon request, shall be provided to the Commission; and (5) financial statements as required by Section 5.7 below.

5.6 <u>Quarterly Reports</u>. Licensees deemed by the Commission to conduct substantial Financial Services shall also be required to file confidential quarterly reports with the Commission sufficient for the Commission to determine Compliance with this Code. Such Quarterly Reports shall, upon request, be provided to the Commission in the same format as the annual report.

5.7 <u>Audit Requirements</u>. On an annual basis, each Licensee shall provide, on a confidential basis, to the Commission annually a true and correct copy of their annual financial statements. If the Licensee's financials are audited or reviewed, such Licensee shall provide such audited financial or reviewed (as applicable) statements to the Commission.

5.8 <u>Public Notice</u>. Each Financial Services Licensee shall have a copy of this Code and any implementing regulations readily available for inspection by any Person at each location where it maintains a presence.

ARTICLE 6

<u>AUTHORIZED FINANCIAL SERVICES TRANSACTIONS</u>

6.1 <u>General Authority</u>. Subject and pursuant to this Code, a Licensee may engage in the business of providing Financial Services as provided in this Code, as may be limited by such Licensee's License.

6.2 <u>Financial Services</u>. Any Licensee may, subject to any limitations as set forth in such Licensee's License or as otherwise imposed by the Commission, offer Financial Services and, in connection therewith, may charge and collect the interest and other charges permitted by this subchapter.

6.3 <u>Collateral</u>. A License may take as collateral any personal property. A Licensee may not take real property as collateral. With respect to any collateral that is tangible personal property, a Licensee must provide a Consumer at least ten (10) days to reinstate the obligation by bringing it current before disposing of the collateral. The taking of an authorization for an ACH debit shall not be deemed a security interest.

6.4 <u>Forms of Credit</u>. Extensions of credit may be open-end credit or closed-end credit. The fact that an open-end extension of credit has a maturity date does not preclude it from being open-end credit.

6.5 <u>Payment Terms</u>. A Licensee may make extensions of credit that are payable in one or more installments. Payments may be weekly, bi-weekly, bi-monthly, monthly, or other periodic basis, as the agreement governing such extension of credit provides. Extensions of credit with a principal amount over $2,000 must be payable in at least three (3) installments.

6.6 <u>Interest</u>. A Licensee may charge and collect interest in respect of any Loan at such daily, weekly, monthly, annual or other periodic percentage rate or rates as the agreement governing such extension of credit provides. For purposes hereof, a year may, but need not, be a calendar year and may be such period of from 360 to 366 days, including or disregarding leap year. Interest may be calculated on a daily earnings method or scheduled due date method. In the event of prepayment in full with respect to the scheduled due date method, unearned interest shall be subject to refund using a daily factor from the date of the last scheduled payment to the date of prepayment in full.

6.7 <u>Variable Rates</u>. If the agreement governing any extension of credit so provides, the periodic percentage rate or rates of interest charged and collected may vary in accordance with a schedule or formula. Such periodic percentage rate or rates may vary from time to time as the rate determined In accordance with such schedule or formula varies and such periodic percentage rate or rates, as so varied, may be made applicable to all or any part of outstanding unpaid amounts of such extension of credit on and after the effective date of such variation.

6.8 <u>Additional Charges</u>. In addition to or in lieu of interest at a periodic percentage rate or rates permitted hereunder, the Licensee may charge and collect, in respect of any extension of credit, any of the following fees and charges as the agreement governing such extension of credit provides:

6.8.1 A late or delinquency charge upon any outstanding unpaid payment or portions thereof under the agreement which are in default; provided, however, that no more than one (1) such delinquency charge may be imposed in respect of any single payment or portion thereof regardless of the period during which it remains in default. Nothing contained in this subdivision shall limit, restrict or otherwise affect the right of a Licensee to change the periodic percentage rate or rates of interest applicable to the agreement upon the occurrence of a delinquency or default or other failure of the Consumer to perform in accordance with the terms of the agreement.

6.8.2 On return of a payment device to a holder of a Financial Services obligation following dishonor of the payment device, the holder, the holder's assignee, agent, or representative, or any other person retained by the holder to seek collection of the face value of the dishonored payment device, may charge the drawer or endorser a reasonable dishonored Item fee of not more than fifty dollars ($50). For purposes of this section, "payment device" means any check, debit card, paper or electronic payment, or other payment device used as a medium for payment, including ACH.

6.8.3 Such other charges as are set forth in the agreement governing such extension of credit including, but not limited to, costs, fees, services, points, premiums and all other reasonable expenses which may be incurred by such applicant in connection with such extension of credit.

6.8.4 No Licensee shall demand, collect or receive from any applicant for Financial Services, directly or indirectly, any other charges, or any greater amounts for any authorized charges than those permitted by this Article.

6.9 <u>Deferred Installments</u>. A Licensee may at any time or from time to time permit a Borrower to defer installment payments of an extension of credit and, in connection with such deferral, charge and collect deferral charges.

6.10 <u>Refinancing</u>.

6.10.1 A Borrower may, with the consent of the Licensee, refinance the entire outstanding and unpaid amount of the extension of credit, and the Licensee may charge and collect a refinancing charge in connection with any such refinancing.

6.10.2 For the purposes of this section, the entire outstanding and unpaid amount of any e^ension of credit shall be deemed to be the total of the unpaid principal balance and the accrued but unpaid interest and other charges and fees on the date of any such refinancing.

6.11 <u>Right of Rescission</u>. No Consumer Financial Services Licensee shall make an extension of credit to a Consumer unless such extension of credit is subject to a minimum one-business day right of rescission on the part of the Consumer. The Consumer Financial Services Licensee may require that the Consumer first return the loan proceeds in order to rescind.

6.12 <u>Complaint Procedure</u>. The contract between a Consumer Financial Services Licensee and a Consumer must include a notice providing contact information for the Commission for filing a complaint.

6.13 <u>Threats of Criminal Prosecution</u>. No Consumer Financial Services Licensee shall pursue or threaten to pursue criminal action against a Consumer in connection with the nonpayment of any amount due, including the unpaid return of any check or ACH transaction.

6.14 <u>Certain Requirements for Short-Term Consumer Extensions of Credit</u>.

6.14.1 The requirements in this Section 6.14 apply to a Consumer extension of credit that is payable in less than 180 days.

6.14.2 The Consumer Financial Services Licensee shall conspicuously disclose in the application substantially the following:

(i)     This extension of credit is designed as a short-term cash flow solution and not designed as a solution for longer term financial problems;

(ii)    Additional fees and interest may accrue if such extension of credit is refinanced; and

(iii)   Credit counseling services are available to Consumers who are experiencing financial problems.

6.14.3 The Consumer Financial Services Licensee must post on any website a prominent statement that reads substantially as follows: 'This loan is not intended to meet long-term financial needs."

6.14.4 The Consumer Financial Services Licensee shall obtain some form of documentation or reference whether electronic or actual documents showing that the principal amount of the extension of credit does not exceed an unreasonable amount of the Consumer's gross monthly income or other verifiable source of income or such specific percentage(s) as may be determined by regulation adopted by the Commission from time to time. The Commission shall oversee any Licensee's methodology to determine a Borrower's demonstrated capacity to repay any loan and to oversee other Consumer-protective measures.

6.15 <u>No Oral Agreements</u>. A Consumer transaction agreement may provide that it represents the entire agreement of the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. Such provisions are enforceable and disallow evidence of oral agreements.

6.16 <u>Electronic Commerce</u>. An electronic signature or assent that is authenticated shall constitute a signature or assent in writing for all purposes.

6.17 <u>Notice of Sovereign Immunity</u>. The Consumer must be provided a notice in a form approved by the Commission regarding preservation of tribal sovereign immunity and exclusive jurisdiction and a Consumer's limited and exclusive rights to submit complaints to arbitration before a national arbitration organization.

6.18 <u>Enforcement of Licensee's Rights and Remedies</u>. In any proceeding in which a Licensee is a party in interest with respect to any transactions with a Consumer, the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents and the payment and business records maintained by the Licensee in the ordinary course of business.

Except for payment, any claims or defenses whatsoever asserted by or on behalf of a Consumer shall be subject to the exclusive jurisdiction of the national arbitration organizations identified in the Consumer's contract or, if none is identified, of the Commission's choosing.

ARTICLE 7

<u>RESOLVING BORROWER DISPUTES</u>

7.1 <u>Tribal Dispute Resolution Procedure Is Arbitration</u>. The Tribe desires to provide a neutral and accessible forum for the expedient resolution of any Consumer disputes and hereby authorizes any wholly-owned Tribal enterprise, at the discretion of the wholly-owned Tribal enterprise, entering into Consumer credit contracts to provide a limited waiver of its sovereign immunity from suit and service of process, which shall apply to any Borrower's Agreement made by a Licensee under this Code, subject to any provisions in the Tribal Constitution.

7.2 <u>Traditional Litigation Not Available</u>. Because of the nature of the Financial Services industry, and the fact that most Consumers anticipated to be served by Tribal Enterprises will receive small-denomination short-term loans, traditional litigation would be cost-prohibitive for Borrowers and likewise inefficient and impractical to address any Tribal sovereignty issues that might be implicated in any dispute.

7.3 <u>Steps in Tribal Dispute Resolution Protocol</u>. Any Consumer's first recourse under this Code shall be to the customer service representatives for the Tribal Enterprise. If the Tribe Enterprise's customer services staff is unable to satisfy a Borrower's concerns, a Borrower's second recourse shall be to submit his or her concerns in writing to the Commission, which shall evaluate the Borrower's complaint in accord with the dispute resolution regulations then in effect, as may be established from time to time by the Commission. If the Borrower remains dissatisfied following his or her exhaustion of remedies made available under the Commission's dispute resolution regulations, the Borrower may, as a final method of recourse, submit his or her complaint in writing to a national arbitration organization of the Borrower's choosing.

7.4 <u>Disclosure to Borrowers</u>. The Tribe's and any Tribal Enterprise's sovereign immunity, and preservation thereof, and the availability of arbitration shall be disclosed in writing in all Borrower's Agreements.

ARTICLE 8

ENFORCEMENT

8.1 Jurisdiction. Except as provided otherwise in this Code, the Commission shall have exclusive jurisdiction over all violations of this Code.

8.2 Civil Violations. Any Financial Services Licensee who violates or fails to comply with any provision of this Code or who fails or neglects to comply with any final order of the Commission may be charged with a violation and given due process. If the Licensee or Person is found to have committed a violation, such Licensee may be required to pay a civil fine to the Commission not to exceed Five Thousand Dollars ($5,000) for each violation. Each day during which any such violation or failure to comply continues after Notice and the Opportunity to Cure, pursuant to Section 8.3, may be treated as a separate violation of this Code, but not to exceed $100,000. Or, at the discretion of the Commission, a violation or series of violations related to the same act or omission may be treated as one violation. A Licensee found responsible for a material violation pursuant to this Code may also be subject to revocation of Its License. An officer or agent of a Licensee who knowingly or recklessly participates in a material violation of this Code may be Individually and separately subject to a civil penalty imposed by the Commission.

8.3 Notice and Opportunity to Cure; Due Process; Notice. The Commission shall provide notice ("Notice") and a reasonable opportunity of at least thirty (30) business days to cure before it initiates any action to utilize any of Its enforcement capabilities In the administration of Its powers and duties hereunder absent exigent circumstances or other good cause. Such Notice shall set forth with specificity the violation to be resolved and set a hearing date no less than ten (10) and no more than thirty (30) business days from the date of the Notice. If the violation Is not satisfactorily cured within that period, the Commission shall provide notice and the opportunity for a hearing comporting with notions of due process if It Is to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder.

8.4 Hearing and Examiner. At the scheduled hearing. the affected parties shall be provided the opportunity to present oral or written testimony regarding the asserted violations, including sufficiency of actions taken by the party to prevent or cure. The Commissioners shall act as examiner for the purpose of holding any hearing, or the Commissioners may appoint an examiner qualified In the law or possessing knowledge or expertise in the subject matter of the hearing for the purpose of conducting any hearing. Any such appointment shall constitute a delegation to such examiner of the powers of the Commission under this Code with respect to any such hearing.

8.5 No Hearing; Voluntary Resolution. Whenever it shall appear to the satisfaction of the Commission that all of the interested parties involved in any dispute or concern have agreed concerning the matter at hand, the Commission may dismiss or approve resolution of the issue, as appropriate, without a hearing.

8.6 Decision. The Commission shall issue a written decision to all affected parties within thirty (30) days after the hearing. Such decision shall be provided to all interested parties and shall

require written approval of the majority of the Commission before any change in Licensing Is enforced.

8.7 <u>Appeals</u>. Affected parties may appeal a Commission determination by filing a written appeal to the BEDCO Board within twenty (20) days of receiving the Commission's final written decision. The BEDCO Board shall place the matter on the agenda of its next regularly scheduled meeting. Any decision of the BEDCO Board on appeal shall be final and not subject to further appeal.

8.8 <u>Purpose of Civil Penalties</u>. The civil fines imposed under this Code are intended to be remedial and not punitive and are designed to compensate the Tribe for the damage done to the peace, security, economy and general welfare of the Tribe, and to compensate the Tribe for costs incurred by the Tribe in enforcing this Code. Any civil fines collected by the Commission shall be paid to the Tribe.

8.9 <u>Seizure and Forfeiture of Property</u>. Property utilized in violation of this Code shall be subject to seizure and forfeiture by order of the Commission pursuant to such implementing regulations as the Commission shall promulgate.

8.10 <u>Cumulative Fines</u>. All civil fines accruing under this Code shall be cumulative and a suit for the recovery of one fine shall not bar or affect the recovery of any other fine, or judgment, penalty, forfeiture or damages nor bar the power of a court of competent jurisdiction to enter an order of contempt, nor bar any criminal prosecution against any officer, director, agent or employee of any Licensee, or any other Person.

## ARTICLE 9

## USE OF PROCEEDS

9.1 <u>Application of Proceeds</u>. The gross proceeds collected by the Tribe from all licensing of Financial Services hereunder and from fines imposed as a result of violations of this Code, shall be applied as follows: (a) first, for the payment of all necessary personnel, administrative costs and legal fees incurred in the enforcement of this Code; and (b) second, the remainder shall be turned over to the general fund of the Tribe and expended by the Tribe for governmental services and programs on the Tribe in accordance with the requirements of the Minto Tribe's Constitution.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

10.1 <u>Severability and Savings Clause</u>. If any provision or application of this Code is determined by judicial review to be invalid, such provision shall be deemed ineffective and void, but shall not render ineffectual the remaining portions of this Code, which shall remain in full force and effect.

*NVM Tribal Credit Code*

10.2 <u>Effective Date</u>. This Code shall be effective as of the date first written above.

10.3 <u>Repeal of Prior Codes</u>. Any and all prior resolutions, laws, regulations, acts or Codes pertaining to the subject matter set forth in this Code are hereby rescinded and repealed in their entirety.

ARTICLE 11

<u>SOVEREIGN IMMUNITY</u>

Nothing contained in this Code nor any act of the Commission is intended to nor does it in any way limit, alter, restrict, or waive Benhti Economic Development Corporation's, Minto Financial's, the Tribe's or the Commission' sovereign immunity from suit, action or service of process. Further, in their roles within the Commission, each Commissioner and Commission employee shall possess sovereign immunity from suit, action and service of process. The Tribe shall indemnify each Commissioner against any and all personal losses, damages, judgments, interest, settlements, fines, court costs and other reasonable costs and expenses of legal proceedings including attorneys' fees and any other liabilities incurred by, imposed upon or suffered by such individual in connection with or resulting from any claim, action, suit or proceeding, actual or threatened, arising out of or in connection with the performance of such Commissioner's duties under this Code. The immunity and indemnification provided by the Tribe pursuant to this Article to Commissioners or Commission employees and agents shall not cover any acts or omissions which involve willful or wanton conduct, breach of good faith, intentional misconduct, or any transaction from which such individual derives an improper personal benefit.