**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUSTIN FAHY; JENNENE STOICESCU; KIMBERLY ADAMS; and WILLIAM NORTHCUTT; on behalf of Plaintiffs and the class members described herein,** | ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 3590** |
| | ) | |
| **MINTO DEVELOPMENT CORPORATION; BENHTI ECONOMIC DEVELOPMENT CORPORATION; DOUGLAS WILLIAM ISAACSON; MINTO FINANCIAL d/b/a Minto Money; and JOHN DOES 1-20,** | ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Justin Fahy, Jennene Stoicescu, Kimberly Adams, and William Northcutt have

sued Benhti Economic Development Corporation (BEDCO), Minto Development

Corporation (MDC), Douglas William Isaacson, and Minto Financial (Minto Money), on

behalf of a class of similarly situated persons. The plaintiffs allege violations of the

Illinois Interest Act, the Illinois Predatory Loan Prevention Act (PLPA), the Illinois

Consumer Fraud Act (ICFA), and the Racketeer Influenced and Corrupt Organizations

Act (RICO). The defendants have moved to compel arbitration of the plaintiffs' claims

and have filed a motion under 28 U.S.C. § 1404(a) asking the Court to transfer the case

to the District of Alaska.  For the reasons stated below, the Court denies both motions.

**Facts**

The Native Village of Minto (Minto Tribe) is a federally recognized Native American tribe located in Minto, Alaska.  In 2018, the Minto Tribe established BEDCO, an economic development corporation.  Shane Thin Elk, who apparently lives in Green Bay, Wisconsin and is alleged to be a member of a different Native American tribe, is the commissioner of the Minto Financial Services Licensing & Regulatory Commission (Commission).  The Commission issued a tribal lending license to Minto Money, a wholly owned subsidiary of BEDCO, prior to 2021.  The lending license was issued "pursuant to and in accordance with the Tribal Credit Code of the Minto Tribe" and authorizes Minto Money to "do business within the jurisdiction of the Minto Tribe." Compl., Ex. N.  The plaintiffs allege that MDC, a corporation based in Fairbanks, Alaska, is the owner of the Minto Money website.  Isaacson is the Chief Executive Officer of MDC.[1]  Third-party vendors also assist in Minto Money's lending operations.

The plaintiffs are Illinois residents who obtained loans through the Minto Money website in 2022 or 2023.  The plaintiffs each borrowed between $500 and $2730 through loans carrying annual interest rates ranging from 466.66% to 792.76%.  Minto Money loan agreements provide that once a consumer submits a completed loan application, Minto Money will evaluate the application from an office "located on tribal land."  Compl., Ex. A at 1.  After a consumer is approved for a loan, a Minto Tribe representative reviews the loan documents and provides final approval.

---

[1] The defendants assert that at the time the plaintiffs obtained loans from Minto Money, MDC and Isaacson had "ceased all involvement" with Minto Money's lending operations.  Defs.' Mot. to Transfer at 3.

Each plaintiff electronically signed a Minto Money loan agreement. All of the agreements contain identical language unless otherwise noted. The plaintiffs' loan agreements state that they are "governed by the laws of the Tribe." *Id.* The loan agreements of three of the four plaintiffs include a governing law provision stating that:

> The laws of the Tribe will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

*Id.* at 4. The governing law provision in Adams' loan agreement is different; it states:

> The laws of the Tribe *and applicable federal law* will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law *and applicable federal law* shall exclusively apply to such dispute.

Compl., Ex. C at 4 (emphasis added).

Each agreement also includes a dispute resolution procedure and an arbitration provision. The agreements state that for any "disputes" that are not resolved through the provided internal dispute resolution process, Minto Money consents to a "limited waiver of sovereign immunity" that is "strictly limited to individual arbitration claims." Compl., Ex. A at 4. Disputes are defined to include "all claims, disputes or controversies" arising from or related to "the validity and scope" of the arbitration provision. *Id.* Although the agreements state that arbitration "shall occur before the American Arbitration Association (AAA)," they also provide that the rules and procedures of the AAA apply to the arbitration only "to the extent those rules and procedures do not contradict the express terms" of the loan agreement or the Minto Tribal Code. *Id.* at 4-5. The agreements mandate that "[t]he arbitrator shall apply

3

applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act." *Id.* at 5. Additionally, the agreements include a class-action/representative action waiver stating that the borrower waives any right to "pursue or participate in representative claims." *Id.* at 4.

The plaintiffs dispute the validity of the partnership between Minto Money and the Minto Tribe and allege that Minto Money "operates primarily for the benefit of non-tribal members." Compl. ¶ 78. The plaintiffs also allege that the role of the Minto Tribe in Minto Money's lending operations is to allow investors to "use the specter of sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities." *Id.* ¶ 79. In the present lawsuit, the plaintiffs argue that the defendants violated the PLPA, the ICFA, and the Illinois Interest Act by contracting for and collecting loans at rates that are usurious under Illinois law. The plaintiffs also assert a RICO claim against Isaacson, who they allege conducted or participated in a pattern of collecting unlawful debts. The defendants have moved to transfer the case to the District of Alaska and to compel arbitration of the plaintiffs' claims.

## Discussion

The parties dispute the sequence in which this Court should consider the pending motions. The defendants ask this Court to rule on their motion to transfer venue and, regardless of the outcome, also rule on their motion to compel arbitration. "The Federal Arbitration Act . . . states that if the parties have an arbitration agreement and the asserted claims are within its scope, the motion to compel cannot be denied." *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004). But section 4 of the Federal Arbitration Act (FAA) provides that arbitration proceedings "shall be within

the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. Consequently, "a district court cannot compel arbitration outside the confines of its district." *Faulkenberg v. CB Tax Franchise Sys.*, *LP*, 637 F.3d 801, 808 (7th Cir. 2011). Thus this Court will address the defendants' motion to transfer first and will consider their motion to compel arbitration only if it first denies the motion to transfer. *See Smith v. Gen. Info. Sols., Inc.*, No. 2:18-CV-230, 2018 WL 4019463, at *2-3 (S.D. Ohio Aug. 23, 2018) (considering only motion to transfer venue despite pending motion to compel arbitration); *Pierucci v. Homes.com Inc.*, No. CV-20-08048-PCT-DWL, 2020 WL 5439534, at *7 (D. Ariz. Sept. 10, 2020) ("Because the Court has granted [party]'s motion to transfer, it denies [other] motions without prejudice so they can be refiled in the [transferee forum].")

The plaintiffs argue that before deciding on the defendants' motions, this Court should address its subject matter jurisdiction because the defendants have indicated that they plan to assert tribal sovereign immunity. This argument is unpersuasive.

First, although courts in other circuits consider tribal sovereign immunity to be a matter of subject matter jurisdiction, *see, e.g.*, *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007), the Seventh Circuit has stated that "the question of sovereign immunity is not jurisdictional." *Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 820 (7th Cir. 2016). Instead, "sovereign immunity . . . is a waivable defense." *Id.* at 822. Thus the defendants' potential assertion of the defense of sovereign immunity, which they included in their answer to the plaintiffs' complaint, has no bearing on this Court's authority to transfer the case. *See Burton v. Ghosh*, 961 F.3d 960, 964-65 (7th Cir. 2020) (discussing requirements for preserving affirmative

5

defense). Additionally, the plaintiffs' reliance on *Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014), is misguided. In that case, the Seventh Circuit considered whether a *tribal* court, not a federal district court, had jurisdiction over the parties' dispute. *Id.* at 782. Tribal court jurisdiction is not at issue in this case, and thus the Seventh Circuit's subject matter jurisdiction discussion in *Jackson* is immaterial.

Second, discovery has not taken place, and the tribal sovereign immunity issue has not been fully briefed. The Court will therefore defer addressing sovereign immunity until asked to do so by one party or the other.

## A. Motion to transfer

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). To justify a transfer of venue, the moving party must demonstrate that "(1) venue is proper in this district; (2) venue [and jurisdiction are] proper in the transferee district; (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interest of justice." *Jaramillo v. DineEquity, Inc.*, 664 F. Supp. 2d 908, 913 (N.D. Ill. 2009) (citation omitted). The parties agree that the first two requirements are met. Defs.' Reply in Supp. of Mot. to Transfer at 4. This Court must "weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62–63 (2013) (quoting § 1404(a)).

"[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of

forum should rarely be disturbed." *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 664 (7th Cir. 2003) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). The party seeking transfer bears the burden of demonstrating that the proposed alternate forum is "clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986). When assessing the convenience of the parties, "the Court should consider the parties' respective residences and their ability to bear the expenses of litigating in a particular forum." *Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc.*, 200 F. Supp. 2d 941, 947 (N.D. Ill. 2002). The interest of justice factors pertain to the "efficient administration of the court system." *Coffey*, 796 F.2d at 221.

### 1. Convenience

The "convenience" factors for a section 1404(a) analysis include (1) the plaintiff's choice of forum; (2) ease of access to proof; (3) the convenience to the witnesses and parties; and (4) the situs of material events. *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 960 (N.D. Ill. 2000).

A plaintiff's choice of forum is afforded "substantial weight . . . particularly where it is also the plaintiff's home forum." *Taylor v. Midland Funding, LLC*, 94 F. Supp. 3d 941, 945 (N.D. Ill. 2015) (citation omitted). Various courts in this district have discounted the weight of a plaintiff's choice of forum in class action suits, *see, e.g.*, *Jaramillo*, 664 F. Supp. 2d at 914, but others have rejected this approach, noting that "unnamed class members presumably benefit from a class representative who is able to aggressively litigate their claims without significant inconvenience due to travel." *Taylor*, 94 F. Supp. 3d at 945 (quoting *AL & PO Corp. v. Am. Healthcare Cap., Inc.*, No. 14 C 1905, 2015 WL 738694, at *3 (N.D. Ill. Feb. 19, 2015)); *O'Connor v. RealPage Inc.*, No.

21 C 6846, 2022 WL 1487374, at *2 (N.D. Ill. May 11, 2022) (Kennelly, J.) (retaining deference to class representative plaintiff's choice of forum).

This Court declines to discount the plaintiffs' choice of forum on this basis. The Seventh Circuit has not adopted this approach, and any reasons for discounting a class representative's choice of forum are less persuasive in this case. In each of the cases the defendants cite in support of their argument that the plaintiffs' choice of forum should be given little weight, the plaintiff(s) sought to represent a *nationwide* class. *See Jaramillo*, 664 F. Supp. 2d at 914 (noting that named plaintiffs' choice of venue may be inconvenient for other plaintiffs in nationwide class action); *Kahn v. Target Corp.*, No. 22 C 4178, 2023 WL 2306940, at *2 (N.D. Ill. Mar. 1, 2023) ("[C]ourts greatly discount the weight given to a plaintiff's choice of forum in putative class actions, particularly when a nationwide class is alleged."). In this case, however, the plaintiffs seek to represent a class consisting only of Illinois residents. Thus Illinois will be the home venue for the entirety of the putative class, and any potential travel inconveniences will be limited.

The defendants also contend that the plaintiffs' choice of forum merits less deference because "another forum has a stronger relationship to the dispute." Defs.' Mot. to Transfer at 6 (quoting *Jaramillo*, 664 F. Supp. 2d at 914). But the legal authority underlying the reasoning of the court in *Jaramillo* comes from *Chicago, Rock Island & Pacific Railroad Co. v. Igoe*, 220 F.2d 299 (7th Cir. 1955), a case where the plaintiff sued outside her home forum. *Id.* at 304. The *Igoe* case is of little value when, as here, the plaintiffs have sued in their home forum. *See Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, No. 15 C 3717, 2015 WL 13653007, at *4 (N.D. Ill. Oct. 29, 2015) (Kennelly, J.), *rev'd on other grounds*, 881 F.3d 520 (7th Cir. 2018); *Qurio Holdings, Inc. v. Comcast*

8

*Cable Commc'ns, LLC*, No. 14 C 7488, 2015 WL 535981, at *1 (N.D. Ill. Feb. 9, 2015) (Kennelly, J.). The plaintiffs' choice of forum is entitled to deference and therefore weighs against transfer.

In evaluating the convenience of witnesses, "a court should look to the nature and quality of the witnesses' testimony with respect to the issues in the case." *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1168 (N.D. Ill. 1995). The defendants assert the convenience of Minto and BEDCO employee witnesses that they contend all reside and work in Alaska. But "the convenience of employee-witnesses is given very little weight." *Hinc v. Lime-O-Sol Co.*, 231 F. Supp. 2d 795, 796 (N.D. Ill. 2002). And because the defendants have not identified with any particularity any Minto Tribe members who would serve as non-party witnesses or the contents of their potential testimony, the possible involvement of any such witnesses does not weigh in favor of transfer. *Perma-Pipe, Inc. v. Liberty Surplus Ins. Corp.*, No. 13 C 2898, 2013 WL 5348382, at *3 (N.D. Ill. Sept. 24, 2013) (concluding defendant's identification of potential nonparty witnesses does not support motion to transfer absent information regarding proposed testimony). Similarly, the plaintiffs' allegations regarding the involvement of non-tribal investors and servicers do not weigh against transfer because they have not provided details regarding the identities or potential testimony of these individuals. One potential non-party witness, Shane Thin Elk, resides in Green Bay, Wisconsin, which is over three thousand miles closer to Chicago than to Fairbanks; this, too, weighs against transfer. The plaintiffs have not, however, identified any non-party witnesses who reside in Illinois.

Each side alleges that it will be substantially inconvenienced if this case

9

proceeds in the other side's preferred forum. The defendants have offered to take the plaintiffs' depositions in their home state, but "if a trial were to occur this concession would not aid plaintiff[s]." *Ballotti v. Oppenheimer Funds, Inc.*, No. 10 C 50116, 2011 WL 13382871, at *5 (N.D. Ill. Feb. 23, 2011). The plaintiffs assert that due to financial constraints they are "not in a position to take off work and participate in litigation in Alaska." Pls.' Resp. to Defs.' Mot. to Transfer at 10. For their part, the defendants point out that Alaska is where they "live and work or where they are headquartered." Defs.' Mot. to Transfer at 8. Given that the plaintiffs and the defendants reside in different states, there is no choice of forum that will avoid inconvenience to some witnesses and parties. In short, the party and witness convenience factors are largely a wash.

The plaintiffs argue that discovery "may well be concentrated in Minnesota and Wisconsin," the locations of the offices of Lochen Thin Elk Denton. Pls.' Resp. to Defs.' Mot. to Transfer at 10. The defendants contend, by contrast, that the "most significant sources of evidence" are located in Alaska. Defs.' Reply in Supp. of Mot. to Transfer at 6-7. But the defendants do not suggest that the documents they identify are "extraordinarily voluminous or otherwise difficult to ship." *Preston v. Am. Honda Motor Co., Inc.*, No. 17 C 3549, 2017 WL 5001447, at *4 (N.D. Ill. Nov. 2, 2017). And in any event, these days nearly all document production takes place electronically; "[m]odern technology has made it easy and cheap to transfer this kind of information between locations." *Ballotti*, 2011 WL 13382871, at *4. "When documents are easily transferable, access to proof is a neutral factor." *First Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 912 (N.D. Ill. 2006). The Court deems this factor neutral.

The parties dispute whether Illinois or Alaska should be considered the situs of

10

material events.  The defendants argue that Alaska is the situs because all individual defendants either live and work there, and it is the location of "all decisions critical to Plaintiffs' claims."  Defs.' Reply in Supp. of Mot. to Transfer at 7.  The plaintiffs counter that because Illinois is the site of collection of the allegedly usurious loans, a significant portion of the events that "form the basis of Plaintiffs' claims occurred in Illinois."  Pls.' Resp. to Defs.' Mot. to Transfer at 9.  But the plaintiffs' allegations focus both on the conduct of the defendants and the financial injuries suffered by the plaintiffs.

The plaintiffs allege that the defendants "[k]nowingly participated in the making and collection of unlawful loans" and that "completed loan documents and details are transmitted to a Minto Tribe representative who may be physically located in Minto."  Compl. ¶¶ 5.a, 35.  These allegations focus on the defendants' corporate decisions, which presumably were at least partly made in Alaska.  The plaintiffs also allege that "the actual lending operations were carried out, and continue to be carried out, in locations other than tribal lands by non-tribal persons."  Pls.' Resp. to Defs.' Mot. to Transfer at 4.  Even taking plaintiffs' allegations as true at this stage, there is no reason to believe that the Minto Tribe members involved in reviewing and approving the loans were not located in Minto.

The defendants cite multiple cases in support of their argument that the situs of material events is the site of the defendant's corporate decision-making, but none of these cases involve lending operations.[2]  In *Jaramillo*, the court found that the material

---

[2] The defendants also cite *Gingras v. Rees*, No. 5:15-CV-101, 2020 WL 13421138 (D. Vt. Apr. 28, 2020), where a district court granted a section 1404(a) motion to transfer in a tribal lending case.  But in that case, the court relied on the test that the Second Circuit has articulated for evaluating section 1404(a) motions, which does not include "situs of material events" as a factor.  *See Gringas*, 2020 WL 13421138, at *18.

events in that case took place at the site of the defendants' business decisions because the "focus" of the plaintiffs' suit was "decisions by Defendants to market and sell" menu items with misrepresented nutritional information. *Jaramillo*, 664 F. Supp. 2d at 914. Similarly, the court's evaluation of the situs of material events in *Jasper v. Danone North American Public Benefit Corp.*, No. 22 C 7122, 2023 WL 4492354 (N.D. Ill. July 12, 2023), was in the context of a case where the lawsuit arose due to the defendant's "marketing and labeling decisions." *Id.* at * 3. The value of these cases is limited given that the design, marketing and sale of a physical product are not at issue here. *See Orthoflex, Inc. v. Thermotek, Inc.*, No. 10 C 1875, 2010 WL 5069700, at *3 (N.D. Ill. Dec. 3, 2010) ("Courts have routinely held that in cases where the design and manufacture of a product is at issue, the situs of material events is where the product was produced.").

The Court finds that both the plaintiffs' injuries and the defendants' decision-making are material events. *See AL & PO Corp.*, 2015 WL 738694, at *3 (concluding both injury and decision-making were material events in consumer protection case). The plaintiffs' consumer fraud claims support the proposition that the situs, or at least a situs, of material events is where the defendants made the business decisions underlying the loan agreements, which in this case is likely Alaska. *Preston*, 2017 WL 5001447, at *3 (explaining both breach of contract and large-scale misrepresentation claims support finding situs of material events is where business decisions occurred). On the other hand, the plaintiffs' allegations also involve loans that were disbursed to Illinois banks, payments that were debited from Illinois bank accounts, and allegedly usurious interest payments that were made by Illinois consumers. *See Kadiyala v.*

*Pupke*, No. 16 C 3549, 2017 WL 2350454, at *6 (N.D. Ill. May 30, 2017) (concluding material events took place in both forums in financial fraud case); *see also O'Connor v. RealPage, Inc.*, No. 21 C 6846, 2022 WL 1487374, at *3 (Kennelly, J.) ("[T]he material events also include the injury that [plaintiff] suffered, which occurred in Illinois."). The bottom line is that this factor is neutral.

In sum, the plaintiffs' choice of their home forum weighs significantly against transfer, and the remaining convenience factors are effectively neutral. "Where the balance of convenience is a close call, merely shifting inconvenience from one party to another is not a sufficient basis for transfer." *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). "Shifting [the] inconvenience" would be the primary effect of transfer here. The defendants have not shown that the claimed inconvenience of an Illinois forum is sufficient to overcome the deference afforded to the plaintiffs' choice of their home forum.

### 2.     Interest of justice

The "interest of justice" factors include "docket congestion," "likely speed to trial in the transferor and potential transferee forums," "each court's relative familiarity with the relevant law," "the respective desirability of resolving controversies in each locale," and "the relationship of each community to the controversy." *Id.*

The majority of the interest of justice factors in this case are neutral. The defendants contend that the average speed of civil litigation is faster in the District of Alaska. But the most recent data demonstrates that the median length of time from filing to disposition for civil cases in the Northern District of Illinois is 5.7 months, compared to 8.2 months in the District of Alaska. *See* Table C-5, U.S. District Courts–

Median Time Intervals From Filing to Disposition of Civil Cases, by Action Taken, During the 12-Month Period Ending December 31, 2023, https://perma.cc/23YP-5E8R. Regardless, the disparity is not large enough to be significant.

Additionally, the defendants' assertion that the District of Alaska has more familiarity with tribal sovereign immunity and other tribal issues does not support their transfer motion. Sovereign immunity is an issue of federal law, and "[w]here a case is based on federal law, a judge in a particular district has no inherent advantage over [a] judge in other districts." *F.T.C. v. Am. Tax Relief LLC*, No. 10 C 6123, 2011 WL 2893059, at *7 (N.D. Ill. July 20, 2011) (citation omitted). Just as importantly, the plaintiffs' contention that a judge in the Northern District of Illinois would be more familiar with the application of Illinois state laws is not a significant consideration, because "federal courts have experience applying the law of foreign states." *Jaramillo*, 664 F. Supp. 2d at 917. The plaintiffs have also raised choice-of-law concerns. But because the interest of justice factors relate to the "efficient functioning of the courts, not to the merits of the underlying dispute," *Coffey*, 796 F.2d at 221, these contentions are immaterial.

The final two factors, the desirability of resolving the controversy in each forum and the relationship of each community to the dispute, are in the Court's view neutral or close to it. The parties disagree as to which forum has a stronger relationship to this case, and as indicated above, material events took place in both Alaska and Illinois. The plaintiffs suffered harm in Illinois and assert claims on behalf of an Illinois-based class, including claims based on an Illinois-specific statute, which demonstrates the state's interest in resolving the dispute. *See Solomon v. Am. Web Loan*, 375 F. Supp.

3d 638, 666 (E.D. Va. 2019) (concluding home forum of borrowers had stronger interest in tribal lending case). Alaska, however, has an interest in resolving the suit as well. The plaintiffs dispute the defendants' assertion that Minto Money's offices and employees are located in Minto, *see* Compl. ¶¶ 38-40, and at this stage the Court accepts the plaintiffs' well-pleaded allegations as true absent contrary evidence from the defendant. *Plotkin v. IP Axess, Inc.*, 168 F. Supp. 2d 899, 900 (N.D. Ill. 2001). But Alaska is home to the Minto Tribe and BEDCO, which granted Minto Money the license to establish its lending business.

To sum up, neither the convenience factors nor the interest of justice factors weigh in favor of transfer. The defendants have not carried their burden of demonstrating that the balance is "strongly" in their favor such that the plaintiffs' choice of forum should be disturbed. *Sojka v. DirectBuy, Inc.*, No. 12 C 9809, 2014 WL 1089072, at *5 (N.D. Ill. Mar. 18, 2014) (citing *In re Nat'l Presto Indus., Inc.*, 347 F.3d at 664). The Court therefore denies the defendants' motion to transfer venue.

## B.    Motion to compel arbitration

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA's provisions reflect "a liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Under the FAA, a court must compel arbitration when three elements are shown: an enforceable written agreement to arbitrate, a dispute that falls within the scope of the arbitration agreement, and a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc*, 417 F.3d

15

682, 687 (7th Cir. 2005); 9 U.S.C. § 4. The party opposing arbitration bears the burden of demonstrating that the arbitration agreement is unenforceable. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

The plaintiffs do not dispute that they each signed a loan agreement including an arbitration provision, and they do not dispute that their claims fall within the scope of that agreement. They argue, however, that the arbitration provisions are unenforceable.

## 1. Delegation clause challenge

Threshold questions of arbitrability, including disputes regarding the enforceability of an arbitration agreement, are "presumptively for courts to decide." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n. 2 (2013). A party can overcome this presumption by showing that the agreement terms "clearly and unmistakably" assign enforceability disputes to the arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted). Unless a party "challenge[s] the delegation clause specifically," courts must enforce a delegation clause and leave to the arbitrator any disputes regarding the enforceability of the arbitration agreement. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

The agreements provide that arbitration is mandatory for any disputes that are not resolved through Minto Money's dispute resolution procedure. Compl., Ex. A at 4. The disputes governed by this clause include any claims arising from or related to "the validity and scope of" the arbitration provision and any "attempt to set aside" the arbitration provision. *Id.* This language is sufficient to demonstrate a clear and unmistakable delegation of the issue of arbitrability. *See Kemph v. Reddam*, No. 13 CV 6785, 2015 WL 1510797, at *4 (N.D. Ill. Mar. 27, 2015) (collecting cases).

The defendants argue that the Court must enforce the delegation clause because the plaintiffs have not properly challenged its validity. The Court disagrees.

The Seventh Circuit has not addressed the enforceability of delegation provisions in tribal lending contracts, but courts in other circuits have concluded that to challenge an agreement's delegation clause, "a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *MacDonald v. CashCall, Inc*, 883 F.3d 220, 226–27 (3d Cir. 2018); *Hengle v. Treppa*, 19 F.4th 324, 335 (4th Cir. 2021) ("A party may contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement."). That said, a contract's delegation clause "must be challenged 'specifically.'" *Bayer v. Comcast Cable Commc'ns, LLC*, No. 12 C 8618, 2013 WL 1849519, at *3 (N.D. Ill. May 1, 2013) (quoting *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1256 (11th Cir. 2012)).

The defendants cite *Rent-A-Center, West* in support of their contention that the plaintiffs' arguments lack the "specificity" needed to constitute a challenge to the delegation clause. Defs.' Reply in Supp. of Mot. to Compel Arb. at 4. But in that case, the plaintiff's arguments regarding the enforceability of the arbitration provision at issue were directed at two specific arbitration procedures: a cost-sharing arrangement and discovery limitations. *Rent-A-Ctr., W.*, 561 U.S. at 74. The Supreme Court found that because the plaintiff had failed to argue that these procedures "*as applied* to the delegation provision rendered *that provision* unconscionable," he could not use the arguments he had advanced regarding the unconscionability of the arbitration provision as a whole to challenge the delegation provision. *Id.*

17

Unlike the plaintiff in *Rent-A-Center*, *West*, the plaintiffs challenge the validity of the governing law provision *as applied to the delegation clause*. In their brief opposing the defendants' motion to compel arbitration, the plaintiffs contend that by disclaiming state and federal law, governing law provision "deprives the arbitrator from applying the body of law necessary to determine arbitrability." Pls.' Resp. to Defs.' Mot. to Compel Arb. at 3. This argument clearly addresses the validity of the delegation clause specifically. And the plaintiffs' arguments regarding the prospective waiver doctrine, discussed below, apply to delegation clauses specifically as well as arbitration agreements generally. *See Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 292-94 (4th Cir. 2020) (holding choice-of-law provisions constituted prospective waiver and therefore rendered delegation clause unenforceable).

Because the plaintiffs have specifically challenged the enforceability of the delegation clause separate from the underlying arbitration provision, the Court must consider whether the loan agreement validly delegates the threshold question of arbitrability to an arbitrator.[3]

### 2. Arbitration provision

#### a. Prospective waiver

---

[3] The defendants argue that the Court should hold the delegation clause enforceable because the "consensus view" among federal courts is that an agreement is enforceable if it incorporates American Arbitration Association (AAA) rules. Defs.' Reply in Supp. of Mot. to Compel Arb. at 5 n. 2. But the "consensus view" that the defendants reference is the proposition that "incorporating the AAA's rules, or similar rules, into a contract clearly and unmistakably delegates arbitrability to the arbitrator," not that a delegation clause that incorporates these rules is necessarily enforceable. *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452, 458 (N.D. Ill. 2021). The plaintiffs do not dispute that the arbitration provision includes a "clear and unmistakable" delegation clause and instead challenge the enforceability of that clause.

Under the prospective waiver doctrine, an arbitration provision that serves as a "prospective waiver of a party's right to pursue statutory remedies" is unenforceable as contrary to public policy. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (citation omitted). As indicated earlier, the Seventh Circuit's case law regarding arbitration provisions in the tribal lending context is limited. But courts in other circuits have held that under the "prospective waiver" doctrine, a choice-of-law provision that mandates the exclusive application of tribal law renders an arbitration provision unenforceable.[4] *See, e.g.*, *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020) ("[A]rbitration agreements that limit a party's substantive claims to those under tribal law, and hence forbid federal claims from being brought, are unenforceable.").

For example, in *Hengle*, the Fourth Circuit considered the enforceability of an arbitration clause within a tribal lending agreement. In that case, multiple Virginia consumers signed an online loan agreement with various online lending entities owned by the Habematolel Pomo of Upper Lake, a federally recognized tribe. *Id.* at 331. The

---

[4] The defendants note that the governing law provision appears in a "different section of the loan agreements than the delegation clause." Defs.' Reply in Supp. of Mot. to Compel Arb. at 4. But a "cardinal principle of contract construction" is that "a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). In this case, the arbitration provision directly incorporates the governing law provision of the agreement into the arbitration provision by instructing the arbitrator to apply "substantive law consistent with the Governing Law" provision in each of the plaintiffs' loan agreements. *See, e.g.*, Compl., Ex. A at 5. This incorporation provides "specific evidence" that the parties intended to apply the governing law provision to the entire arbitration provision, including the delegation clause. *See Wal-Mart Stores, Inc. v. Helferich Pat. Licensing, LLC*, 51 F. Supp. 3d 713, 719 (N.D. Ill. 2014) (citation omitted) (noting lack of language in contract evidencing parties' intent to apply general choice-of-law provision to arbitration agreement).

loan agreements included multiple provisions that mandated the application of Habematolel Pomo of Upper Lake tribal law for the underlying loan agreement as well as any future arbitration. *Id.* at 332. Specifically, the loan agreements included a "governing law" provision that provided the agreement "shall be governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance." *Id.* The loan agreements also contained an arbitration provision that stated that disputes would be "governed by the laws of the Habematolel Pomo of Upper Lake" as well as the procedures of the "applicable arbitration organization," but only to the extent those procedures "d[id] not contradict the express terms of this Arbitration Provision or the law of the Habematolel Pomo of Upper Lake." *Id.* The agreements instructed the arbitrator to "apply applicable substantive Tribal law consistent with the Federal Arbitration Act (FAA)." *Id.*

The court in *Hengle* found that the prospective waiver doctrine applied to both the delegation clause and the arbitration provision in the Habematolel Pomo of Upper Lake loan agreements. *Id.* The Fourth Circuit concluded that the delegation clause "would require the arbitrator to determine whether the arbitration provision impermissibly waives federal substantive rights without recourse to federal substantive law" and thus was "unenforceable as a violation of public policy." *Id.* at 338. Similarly, the court held that the overall arbitration provision "unambiguously attempt[ed] to apply tribal law to the exclusion of substantive federal law" and therefore "function[ed] as a prospective waiver of the borrowers' rights to pursue federal statutory remedies." *Id.* at 342. The court also noted that although the choice-of-law provisions did not explicitly disclaim the application of federal law, they operated as an implicit prospective waiver because by

"demand[ing] exclusive application of tribal law," the provisions "thereby preempt[] application of other authority." *Id.* at 339.

### i. Fahy, Stoicescu and Northcutt loan agreements

The Court finds no significant distinction between the choice-of-law provisions in the Fahy, Stoicescu and Northcutt loan agreements and the provisions that have been found to constitute prospective waivers of federal rights in other cases. The governing law provision in these agreements states that "[t]he laws of the Tribe will govern this Agreement, without regard to the laws of any state or other jurisdiction." Compl, Ex. A at 4. It also states that "[t]ribal law shall *exclusively* apply" to any "dispute" between the borrower and the lender. *Id.* (emphasis added). The arbitration provisions also instruct the arbitrator to "apply applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act." *Id.* at 5. Requiring the arbitrator to apply a governing law provision that explicitly excludes "the laws of any state or other jurisdiction" demonstrates a clear attempt to disclaim the application of state and federal law in arbitration proceedings.

The defendants direct the Court's attention to language in the loan agreements that provides that "[t]he arbitrator shall apply applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act, 9 U.S.C. §§1-16 ('FAA')." Compl., Ex. A at 5. But references to the FAA "do not mend the prospective waiver of federal law wrought by the arbitration provision's other terms." *Harris v. FSST Mgmt. Servs., LLC*, No. 22 C 1063, 2023 WL 5096295, at *5 (N.D. Ill. Aug. 9, 2023) (Leinenweber, J.) (quoting *Hengle*, 19 F.4th at 342.). As the Fourth Circuit noted when discussing identical language in *Hengle*, a contract provision

instructing the arbitrator to apply tribal law consistent with the FAA "does not require the content of tribal law *to be consistent* with the FAA or limit its application in the arbitration *to the extent* it is consistent with the FAA." *Hengle*, 19 F.4th at 340. Construing this clause to allow a claimant to pursue federal rights and remedies in arbitration that are not available under the laws of the Minto Tribe conflicts with the loan agreement's governing law provision, which provides that "Tribal law shall exclusively apply" in the event of a "bona fide dispute" between the borrower and the lender. Compl., Ex. A at 4. This limitation also applies to the delegation clause, as the loan agreement defines "dispute" to include threshold questions of arbitrability. *See id.*

The defendants argue that the governing law provision does not serve as a prospective waiver of federal rights because Minto Tribe law "incorporates federal statutes." Defs.' Reply in Supp. of Mot. to Compel Arb. at 7. But the section of the Minto Credit Code that the defendants highlight fails to establish that the exclusive application of tribal law would not bar claimants from pursuing federal rights and remedies.

Section 5.1 of the Minto Credit Code lists numerous federal laws that the Tribe requires business licensees to "comply with the spirit of." Pls.' Resp. to Defs.' Mot. to Compel Arb., Ex. A at 12. As the plaintiffs point out, RICO, the federal statute that governs the plaintiffs' claims in this suit, is not included in that list. *See* Pls.' Resp. to Defs.' Mot. to Compel Arb. at 10. The defendants counter that the list of federal statutes included in section 5.1 is "non-exhaustive" and assert that the Credit Code "requires compliance with the principles of *all* applicable federal laws without limitation." Defs.' Reply in Supp. of Mot. to Compel Arb. at 7. But even were the Court to accept this

reading of section 5.1's language, requiring a licensee to "comply" with a particular law is not equivalent to allowing borrowers who contract with that licensee to vindicate their statutory rights under that law. *See Harris*, 2023 WL 5096295, at *5 ("[C]ompliance with federal law in lending is not the same as making available the vindication of federal and state statutory rights in an arbitral setting."); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 343 (4th Cir. 2020) (explaining tribal ordinance requiring lenders to comply with all applicable federal laws does not bar application of prospective waiver doctrine). The Minto Credit Code contains no provision describing the penalties for a violation of federal law but instead provides that violations of the Code's provisions may result in business license suspensions/revocations, civil fines, and seizure of the licensees' property. Pls.' Resp. to Defs.' Mot. to Compel Arb., Ex. A at 3, 18-19. These penalties are all imposed by the Commission directly upon the licensee; they do not suggest that an aggrieved claimant has the ability to assert a federal statutory claim under Minto Tribe law.

And because the Minto Credit Code does not outline a process or procedure by which a borrower can pursue claims for violations of its provisions, section 5.1 does not show that Minto Tribe law allows the plaintiffs to assert a RICO claim against any of the defendants or vindicate the remedies available under RICO. *See Haynes*, 967 F.3d at 344 ("[E]ven if the borrowers could assert a RICO claim against the [defendants] under tribal law, the rest of the Ordinance fails to clarify how any consumer could meaningfully pursue any claims under it."). For example, section 5.1 of the Minto Credit Code applies specifically to "Consumer Financial Services Licensees." Pls.' Resp. to Defs.' Mot. to Compel Arb., Ex. A at 12. And the language of the Credit Code expressly distinguishes

a licensee, such as Minto Money, from a person or entity associated with a licensee, such as MDC or Isaacson. *See id.* at 5. Even if the Credit Code authorized the vindication of federal statutory rights against licensees, it is unclear to what extent, if any, the non-licensed defendants would be subject to the provisions of the Credit Code.

Furthermore, multiple provisions in the Minto Credit Code undermine the defendants' assertion that it incorporates federal laws and regulations "without limitation." The "enforcement" section of the Credit Code mandates that notwithstanding the Code's other provisions, "the Commission shall have exclusive jurisdiction over all violations of this Code." *Id.* at 18. Additionally, the Credit Code's language demonstrates that the Minto Tribe intends primarily for its own laws, rather than federal laws, to apply to its lending operations. The Credit Code specifies the Minto Tribe's intention to use its "own sovereign governmental regulation and oversight" to "provide sufficient control and protection for both lenders and Borrowers." *Id.* at 3. The Credit Code also provides that the Minto Tribe "recognizes that several state and federal agencies have an interest in this industry" but that it intends to "serve as its own regulator for all lenders operating from its sovereign lands." *Id.*

The defendants contend that under *Smith v. Board of Directors of Triad Manufacturing, Inc.*, 13 F.4th 613, 621 (7th Cir. 2021), the prospective waiver doctrine applies only when an arbitration provision "*expressly forbids*" the pursuit of federal statutory rights. Defs.' Reply in Supp. of Mot. to Compel Arb. at 8 n. 5. In *Smith*, the Seventh Circuit found an arbitration agreement unenforceable because it precluded the type of relief that the plaintiff sought under the Employee Retirement Income Security Act (ERISA). *Smith*, 13 F.4th at 621-22. But the defendants read the holding of *Smith*

24

too narrowly.  In that case, the arbitration agreement did not expressly prohibit remedies under ERISA but instead "prohibit[ed] relief that ERISA expressly permit[ed]."  *Smith*, 13 F.4th at 615.  Specifically, the Seventh Circuit found that the arbitration agreement's term prohibiting additional relief to any beneficiary other than the claimant could not be "reconciled" with ERISA's express authorization of the removal of a fiduciary as a remedy.  *Id.* at 621.

Similarly, the plain text of the Minto Credit Code cannot be reconciled with the statutory rights and remedies available under RICO.  The defendants assert that Minto Tribe law incorporates RICO's substantive rights, "including its private right of action and treble-damages remedy," but they do not point to or provide any language in the Credit Code or other Minto Tribe laws to support that assertion.  Defs.' Reply in Supp. of Mot. to Compel Arb. at 7.  In fact, the Credit Code does not mention any individual rights for consumers and instead provides only a process by which the tribe can penalize licensees for Code violations.  For example, section 8.2 of the Credit Code provides that any licensee "who violates or fails to comply with any provision of this Code" may be subject to "civil fine to the Commission not to exceed Five Thousand Dollars ($5,000) for each violation."  Pls.' Resp. to Defs.' Mot. to Compel Arb., Ex. A at 18.  This express limitation on civil penalties, which are paid to the Minto Tribe rather than to an aggrieved consumer, demonstrates that under the Credit Code the plaintiffs would be unable to effectively vindicate a federal statutory claim for treble damages, a remedy they would be authorized to seek under RICO.

The Court agrees that the exclusive application of Minto Tribe law would not allow the plaintiffs to effectively vindicate the federal rights and remedies they seek.

Both the delegation clause and the arbitration provision operate as prospective waivers and are therefore unenforceable.

### ii.     Adams loan agreement

The governing law provision in the Adams loan agreement, worded slightly differently, states that "[t]he laws of the Tribe *and applicable federal law* will govern this Agreement, without regard to the laws of any state or other jurisdiction."  Compl., Ex. C at 4 (emphasis added).  But even if this Court reads the governing law provision in the Adams agreement to allow for the vindication of federal rights, the delegation clause and arbitration clause remain unenforceable as a prospective waiver of state-law rights.

The defendants do not dispute that the arbitration provision does not allow the plaintiffs to vindicate their rights under any state law.  Instead, the defendants assert that a prospective waiver of state rights would not render the arbitration provision unenforceable because the defendants are not subject to the state laws under which the plaintiffs seek relief.  This argument lacks merit.

The plaintiffs seek damages for violation of the PLPA, among other state statutes.  The PLPA, enacted in March 2021, is a "consumer protection law" aimed at "protect[ing] consumers from predatory loans."  815 ILCS 123/15-1-1.  The PLPA caps the annual percentage rate for unpaid loans at thirty-six percent.  815 ILCS 123/15-5-5. The defendants contend that the PLPA's provisions do not apply to BEDCO or Minto Money because they are "Tribal entities organized and licensed to do business under the laws of the Tribe."  Defs.' Reply in Supp. of Mot. to Compel Arb. at 10.  But the PLPA provides an exemption only for "banks, savings banks, savings and loan associations, credit unions, and insurance companies" that meet certain requirements; it

26

does not mention tribal entities.  815 ILCS 123/15-1-15.  BEDCO is not a bank or a financial institution, and it would be illogical for this Court to construe this provision to mean that private lenders such as Minto Money are exempt from the provisions of the PLPA, which applies to "any person or entity that offers or makes a loan to a consumer in Illinois."  *Id.*

Furthermore, the only federal court to consider the applicability of the PLPA in the tribal lending context ruled that a prospective waiver of state rights rendered an arbitration agreement unenforceable specifically *because* it precluded the borrowers from obtaining relief under the PLPA.  *Harris*, 2023 WL 5096295, at *7.  This Court agrees with the analysis in *Harris*.  Additionally, the defendants contend that as out-of-state lenders they are not subject to Illinois laws, but in the case they cite to support that argument, the court held that the plaintiff's state usury claims were preempted by the National Bank Act (NBA) and the Federal Deposit Insurance Act (FDIA).  *See Sawyer v. Bill Me Later, Inc.*, 23 F. Supp.3d 1359, 1361, 1370 (D. Utah 2014).  The NBA and the FDIA apply only to banks, not non-bank entities such as Minto Money.  *Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537, at *5 (N.D. Ill. Mar. 30, 2017); *West Virginia v. CashCall, Inc.*, 605 F. Supp. 2d 781, 785 (S.D.W. Va. 2009).  In addition, the PLPA provides that a person or entity may not evade its requirements by facilitating the issuance of a loan that is usurious under the law "regardless of whether the person or entity has a physical location in the State."  815 ILCS 123/15-5-15.

The defendants also contend that "by strictly engaging in conduct on Tribal land, Defendants are not subject to state law."  Defs.' Reply in Supp. of Mot. to Compel Arb. at 10.  The plaintiffs allege, however, that Minto Money's lending operations take place

largely outside tribal land.  *See* Compl. ¶¶ 34-40.  And even putting these allegations

aside, the defendants misstate federal law.  In *Mescalero Apache Tribe v. Jones*, 411

U.S. 145 (1973), the Supreme Court held that absent special circumstances, states lack

"authority for taxing Indian reservation lands or Indian income from activities carried on

within the boundaries of the reservation."  *Id.* at 1270.  But the Supreme Court has

noted that state *taxation* of activities taking place on tribal land merits special

consideration.  Its decision in *Mescalero Apache Tribe* does not support the proposition

that *any* conduct that occurs on tribal land is not subject to state law.  *County of Yakima*

*v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 257-58 (1992).

The defendants cite no supporting authority for the proposition that state usury laws are

inapplicable to tribal lending entities located on tribal land—particularly in a situation like

the present one where the entity makes loans to borrowers outside the tribal land—and

multiple federal and state courts have rejected this proposition in the context of online

lending.  *See Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo.

2011) (citation omitted) ("Business conducted over the Internet that would confer

jurisdiction on a state court also demonstrates that the business activity constitutes off-

reservation activity."); *Hengle*, 19 F.4th at 349 (collecting cases).

      The defendants also contend that the prospective waiver doctrine applies only to

waivers of federal law.  But the Supreme Court directly addressed this contention in

*Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639 (2022).  In that case, the defendant

argued in briefing that the prospective waiver doctrine applied only to waivers of federal

statutes.  *Id.* at 653 n.5.  The Court rejected the defendant's argument as "erroneous"

and highlighted its discussion of the prospective waiver doctrine in *Preston v. Ferrer*,

552 U.S. 346 (2008), a case that concerned state law claims. *Id.* The defendants attempt to downplay the significance of the Supreme Court's language by calling it "dicta." Defs.' Reply in Supp. of Mot. to Compel Arb. at 9. But the Seventh Circuit has stated that absent controlling precedent, considered Supreme Court dictum "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it." *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994).

This Court finds no reason to discount the Supreme Court's express rejection of the defendant's argument in *Viking River Cruises, Inc.* The only case the defendants cite in support of their argument here was decided before *Viking River Cruises, Inc.*, and multiple federal courts that have considered the issue both pre- and post-*Viking River Cruises, Inc.* have concluded that the prospective waiver doctrine also applies to waivers of state rights and remedies. *See Harris*, 2023 WL 5096295, at *4 (considering federal and state statutory rights in prospective waiver analysis); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019) ("[W]e conclude that the arbitration agreements are unenforceable because they are designed to avoid federal and state consumer protection laws."); *Fitzgerald v. Wildcat*, No. 3:20-CV-00044, 2023 WL 5345302, at *9 (W.D. Va. Aug. 18, 2023) (citing *Viking River Cruises, Inc.* in support of applying prospective waiver doctrine to waivers of state law).

In view of the clear guidance from the Supreme Court, as well as the persuasive authority from courts in this district and other circuits, this Court holds that the prospective waiver of federal and state statutory rights and remedies renders the delegation clause and arbitration provision unenforceable in all of the plaintiffs'

29

agreements.

### b. Unconscionability

Under Illinois law, a contract provision may be unenforceable where it is "unconscionable on either procedural or substantive grounds." *Jackson*, 764 F.3d at 777. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* (quoting *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 854 N.E.2d 607, 622 (2006)). Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Jackson*, 764 F.3d at 778 (quoting *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 857 N.E.2d 250, 267 (2006)).

### i. Procedural unconscionability

"Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Jackson*, 764 F.3d at 777–78. "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of meaningful choice." *Cannon v. Burge*, 752 F.3d 1079, 1102 (7th Cir. 2014).

The plaintiffs argue that the arbitration provision is procedurally unconscionable because it "evad[es] federal and state law" and "purports to apply tribal law which cannot be applied." Pls.' Resp. to Defs.' Mot. to Compel Arb. at 17-18. But this is simply a variation of the plaintiffs' argument that the arbitration provision deprives the

borrower of federal and state statutory rights. And the plaintiffs' contention that the application of tribal law forecloses certain federal or state remedies raises substantive, not procedural, unconscionability concerns. *See ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 944 (N.D. Ill. 2012) (noting plaintiff's argument regarding unreasonable contract terms supported substantive rather than procedural unconscionability claim).

Furthermore, the legal authority that the plaintiffs provide does not support their procedural unconscionability allegations. For example, the plaintiffs cite *Montana v. United States*, 450 U.S. 566 (1981), in support of their proposition that the Minto Tribe has no "legislative or judicial jurisdiction" over conduct "committed by nonmembers against other nonmembers off the reservation." *See* Pls.' Resp. to Defs.' Mot. to Compel Arb. at 17. In *Montana*, the Supreme Court held that a tribe did not have the authority to regulate the hunting and fishing activity of nonmembers on lands within its reservation. *Montana*, 450 U.S. at 544. But *Montana* did not involve an arbitration agreement, and the general principle that tribal law does not apply to off-reservation conduct by nonmembers is inapplicable in a contract where the parties have expressly agreed that tribal law will govern. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016) ("[P]arties are free within bounds to use a choice-of-law clause in an arbitration agreement to select which local law will govern the arbitration.").

The plaintiffs also cite *Jackson* and *Harris* in support of their argument that the defendants have not established tribal jurisdiction. *See* Pls.' Resp. to Defs.' Mot. to Compel Arb. at 17. In both cases, a court held a tribal lending agreement procedurally unconscionable under Illinois law. *Jackson*, 764 F.3d at 777-81; *Harris*, 2023 WL

31

5096295, at *5.  But those cases are distinguishable.

The court in *Jackson* found an arbitration agreement procedurally unconscionable because the tribe had not established the existence of the arbitration procedure or consumer dispute rules referenced in the agreement.  *Jackson*, 764 F.3d at 778.  The Seventh Circuit found that the inclusion of an "illusory" arbitration forum in the agreements rendered the plaintiffs unable to "ascertain the dispute resolution processes and rules to which they were agreeing."  *Id.* at 776, 778.  And the court in *Harris* concluded that the loan agreement was procedurally unconscionable because it "applie[d] tribal arbitration law which d[id] not exist."  *Harris*, 2023 WL 5096295 at *6.  Here, however, the plaintiffs have not claimed that the loan agreement applies illusory tribal law or relegates the dispute to an illusory tribal forum.  *See generally* Pls.' Resp. to Defs.' Mot. to Compel Arb. at 17-18.  And because the loan agreements authorize the AAA, rather than a Minto Tribe judicial forum, to oversee the arbitration proceedings, the Court need not consider the plaintiffs' arguments regarding whether the defendants' conduct is subject to tribal court jurisdiction.

The Court concludes that the plaintiffs have not demonstrated that the arbitration provision in the loan agreements is procedurally unconscionable.

### ii.    Substantive unconscionability

"Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an innocent party."  *Cannon*, 752 F.3d at 1102.  The plaintiffs argue that the loan agreements are substantively unconscionable because the governing law provision prohibits the application of state laws such as the

32

PLPA and therefore violates Illinois public policy.[5]  This Court determines the public policy of a state through "its constitution, legislative enactments and judicial decisions." *Pactiv LLC v. Perez*, No. 20 C 1296, 2020 WL 7123070, at *6 (N.D. Ill. Dec. 4, 2020).

This Court concludes that the governing law provision violates Illinois public policy, for three reasons.  First, the Illinois Supreme Court has not addressed whether an agreement that bars relief under the PLPA violates Illinois public policy.  But recently, a court in this district found that choice-of-law terms that waive protection under the PLPA are sufficient to render an arbitration agreement substantively unconscionable. *Harris*, 2023 WL 5096295, at *7.  This Court agrees with the analysis in *Harris*.

Second, the PLPA contains a provision that expressly forbids a waiver of its provisions.  815 ILCS 123/15-10-25 ("There shall be no waiver of any provision of this Act.").  Federal and state courts have found that a nonwaiver provision is indicative of the Illinois legislature's intent to establish public policy.  *Midwest Enters., Inc. v. Generac Corp.*, No. 91 C 2229, 1991 WL 169059, at *4 (N.D. Ill. Aug. 27, 1991)

---

[5] In their briefing, both parties reference Illinois's choice-of-law rules.  But this choice-of-law framework is used to determine whether an Illinois court will enforce a choice-of-law provision in a contract, not whether the choice-of-law provision itself is unenforceable due to unconscionability.  *Marzano v. Proficio Mortg. Ventures, LLC*, 942 F. Supp. 2d 781, 792 (N.D. Ill. 2013).  The plaintiffs argue that the arbitration provision is unenforceable under Illinois law.  The defendants do not dispute that Illinois law governs the validity of the arbitration agreements, and thus they have waived any argument regarding which body of law controls the validity of the governing law provision. *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001).  Because both parties agree that Illinois law applies, there is no need for a choice-of-law analysis. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991); *see also Harris*, 2023 WL 5096295, at *6-8 (addressing the substantive conscionability of the parties' arbitration agreement without applying the Illinois choice-of-law framework).  Even if the defendant had properly raised a choice-of-law argument, the Court would decline to enforce the governing law provision on the ground that the legality of the contract is in question. *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015).

(concluding statute's nonwaiver provision articulated public policy of the state); *Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 640 N.E.2d 1000, 1005 (1994) (concluding that statutory provision voiding any contract waiving Sales Act provisions demonstrated Illinois public policy); *Harrington v. Champps Operating Corp.*, No. 11 C 643, 2011 WL 1118523, at *2 (N.D. Ill. Mar. 24, 2011) (discussing proposition that nonwaiver provision evidences state public policy).

Third, the Minto Credit Code authorizes licensees to charge and collect interest at any rate "as the agreement governing such extension of credit provides."   Pls.' Resp. to Defs.' Mot. to Compel Arb., Ex. A at 14.  Consequently, applying the loan agreements' governing law provisions would foreclose the plaintiffs' PLPA, ICFA and Illinois Interest Act claims arising from illegally high interest rates.  Federal and state courts have found that the denial of protections provided under Illinois law evidences a violation of Illinois public policy.  *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 812–13 (N.D. Ill. 2022) ("Because applying Washington law would leave Plaintiffs without recourse under BIPA or any analogous right of action, it would undermine the fundamental Illinois public policy of protecting individual privacy rights over biometric data."); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 816 (N.D. Ill. 2009) (finding Florida law violated Illinois's public policy by providing weaker protections for workers subject to restrictive covenants); *Turner v. Concord Nursing & Rehab. Ctr., LLC*, 2023 IL App (1st) 221721, 218 N.E.3d 456, 463 (holding arbitration agreement substantively unconscionable for limiting recovery authorized by the Illinois Consumer Fraud Act).  The arbitration provisions in the plaintiffs' loan agreements undermine the Illinois public policy of "protect[ing] consumers

34

from predatory loans." 815 ILCS 123/15-1-5.

The defendants cite *Mori v. East Side Lenders, LLC*, No. 11 C 1324, 2015 WL 13654184 (N.D. Ill. Mar. 24, 2015), in support of their contention that the plaintiffs must first establish that they are entitled to protection under Illinois law before they show that a waiver of these protections renders the agreements unconscionable. But *Mori* is distinguishable from the instant case. In *Mori*, the court had granted the defendant's motion to compel arbitration and was considering the plaintiff's argument that the arbitrator must not enforce the loan agreement's choice-of-law provision "because the chosen law (Delaware) is contrary to the fundamental public policy of Illinois." *Id.* at *5. Here, the plaintiffs are arguing that the governing law provisions render the arbitration provision unenforceable, not that the arbitrator should refuse to enforce the governing law provisions. *See Harris*, 2023 WL 5096295, at *7 (distinguishing the *Mori* plaintiff's governing law argument from an arbitration agreement enforceability argument). Furthermore, the court's discussion of "waiver" in *Mori* was in the context of the plaintiff's argument that the arbitrator must apply Illinois law because the statute under which the plaintiff sought relief prohibited contractual waivers of its protections. *Mori*, 2015 WL 13654184, at *5. For the plaintiffs' substantive unconscionability argument, the relevant question is not solely whether applying the chosen law violates the PLPA's anti-waiver provision, but also whether the arbitration provision's waiver of the protection provided by the PLPA violates Illinois public policy. *Harris*, 2023 WL 5096295, at *7.

The Court concludes that the governing law provision's waiver of protections under state statutes, including the PLPA, renders the arbitration provision substantively unconscionable.

**c.** **Class action waiver**

The parties dispute whether the loan agreements' class action waiver is enforceable. This dispute is premature. Because the plaintiffs have not filed a motion for class certification, this Court will defer consideration of the enforceability of the class action waiver.

## Conclusion

For the reasons stated above, the Court denies the defendants' motion to transfer venue [dkt. no. 23] and their motion to compel arbitration [dkt. no. 25]. The telephonic status hearing set for March 18, 2024 is vacated and reset to March 25, 2024 at 9:15 a.m., using call-in number 888-684-8852, access code 746-1053. The parties should confer regarding a discovery and pretrial schedule and are directed to file a joint status report with a proposed schedule (or alternative proposals if they cannot agree) by March 22, 2024.

Date: March 14, 2024

MATTHEW F. KENNELLY
United States District Judge

36